### BEER et al. v. UNITED STATES.
#### No. 48588.

United States Court of Claims.
Nov. 6, 1951.

Ben F. Foster, San Antonio, Tex., for plaintiffs.

Paris T. Houston, Washington, D. C., Newell A. Clapp, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

The two questions presented in this case are (1) did defendant's warranty in its written statement to bidders that the 900 generators offered for sale were "new and in good condition," reasonably justify the purchaser of such generators in believing that the generators were in operating condi-

tion; and (2) the market value of generators as warranted, and the market value thereof in their actual condition.

The plaintiffs were associates in the joint venture of buying from defendant, for the purpose of resale in the market early in 1946, 900 portable, gasoline engine-driven, Kohler electric generators.

These generators had been purchased by defendant from the manufacturer in 1943 at $385.70 per unit. None of them had been used. They were declared surplus property and, except for the purpose of inspection for public sale by the Inspection Division of the War Assets Administration, the generators had been held in storage in the original factory crates (findings 3–6).

After the Inspection Division of the War Assets Administration had made an inspection and a report that the generators were new and in good condition the defendant advertised them for sale at a unit price of $268, and expressly represented in such advertisement that the generators were new and in good condition. No reference was made by defendant in the advertisement or in the negotiations of sale with plaintiffs as to when the generators had been purchased, or where they had been stored. After negotiation the plaintiffs, on April 17, 1946, purchased the generators for $217,080 cash at a unit price of $241.20, and the full purchase price was paid before the generators were shipped to plaintiffs at San Antonio, Texas. The unit price of $241.20 was agreed upon because defendant was anxious to dispose of all the generators and plaintiffs were willing to take the entire lot of 900 generators, at that price. The negotiated price was not the result of any modification or qualification of defendant's warranty that the generators were new and in good condition.

When the representatives of plaintiffs went to Ft. Belle Mead, New Jersey, to survey the entire lot of generators and to inspect those available for inspection, they were assured by defendant's authorized sales agent there, at the time of inspection, that the generators were new and in good condition; that they were "ready to go" and should operate for the purpose for which they were manufactured. One generator was uncrated and was inspected by plaintiffs. The written purchase order of plaintiffs, delivered to and accepted by the Washington Officials of the War Assets Administration, expressly stated that the generators were being purchased on the basis of defendant's representation that they were new and in good condition. The generators were purchased by plaintiffs for resale in the market, in reliance upon the representations by defendant as to the conditions of the generators, which representations the plaintiffs interpreted as meaning that the generators had not been used and that they would operate without the necessity for repairs; that it would not be necessary for plaintiffs, before offering the generators for sale to farmers and others having need for such equipment, to uncrate, disassemble and repair, and recrate the generators in order to put them in operating condition.

From the evidence of record we are of the opinion that defendant intended to represent, and that it did warrant, that the generators would operate. The defendant's manual of instructions, under which its inspectors worked and in accordance with which they submitted their reports upon the basis of which the authorized Government officials made representations as to the condition of articles offered for sale, fully supports the conclusion that defendant intended to represent to the purchaser that the generators were in operating condition. Moreover, the term "good condition" when used without any qualification, and when applied to a machine, reasonably conveys the idea that the machine will operate.

The defendant was in a better position than the plaintiffs, to know the actual condition of the generators. Defendant knew the length of time they had been held in storage and whether they had been shipped overseas and back. The purpose of the surplus property law was to get equipment no longer needed by the Government into the channels of trade where it was needed following the end of hostilities. The price of $268 each which the WAA placed on these generators indicates that it regarded them as being in operating condition. The proof in this case is clear

that such a price was far too high for generators in the condition in which these were found. The WAA Inspection Manual cautioned inspectors against misleading representations in the inspection and sale of surplus property, and we think the defendant's officials believed and intended to represent that these machines would operate. Defendant's counsel argues that some of the generators when uncrated, inspected and tested, operated perfectly; that some required adjustments and minor repairs, and some were in poor condition, and that, therefore, the condition of the entire lot of generators averaged "good," and plaintiffs should be denied recovery. From the record we cannot say that any of the generators were in better than good condition. Many of them were in poor condition, some were in fair condition. In view of the facts which defendant's officials knew or should have known concerning the generators, such generators, instead of being warranted by them as "new and in good condition" should have been described as "new, in fair condition; repairs required" (see finding 4). The defendant's officials were in possession of sufficient facts to warrant them in thus describing these generators.

The generators purchased by plaintiffs were not in good condition, as represented by defendant (findings 7–14). So many of them were in poor condition that none could be offered for sale by plaintiffs as being in the condition represented by defendant until each machine had been uncrated, tested, and repaired, where necessary. This involved great expense. The repairs needed to place the machines in good operating condition varied in accordance with the number of defects found, and included removal of external and internal rust, remagnetizing the magnetos, and replacement of broken parts. At the time involved, the reasonable cost of such repairs was $25 to $50 per unit. Due to the poor condition of the generators and the expense involved of having each machine uncrated, disassembled, inspected, and of having the necessary repairs made, the plaintiffs were compelled to sell the machines at a very substantial loss.

On the facts of record we think it is clear that defendant misrepresented the condition of the machines sold, and is liable to plaintiffs for breach of warranty. The proper measure of plaintiffs' damages for this breach is the difference between the market value of the 900 generators, had they conformed to the warranty, and the actual market value thereof at the time of sale. The rule is well stated in 46 Am.Jur., Sales, pp. 863–64, Sec. 738; and Union Selling Co. v. Jones, 8 Cir., 128 F. 672.

We have carefully studied the facts and circumstances of record and have reached the conclusion, as set forth in finding 17, that if the generators had been in the condition as represented by defendant, their fair market value on April 17, 1946, the date of sale, would have been $225,000, and that the actual fair market value of the 900 generators on that date was $157,500.

The plaintiffs are, therefore, entitled to recover $67,500, and judgment for that amount is entered in their favor. It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN and WHITAKER, Judges, concur.